**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. _____________**

*In re* Application of

Clivedale Ventures Limited,
Clivedale Overseas Limited,
Papiss Limited, and IPMT
Limited,

Applicants,

Pursuant to 28 U.S.C. § 1782 for Judicial
Assistance in Obtaining Evidence for Use in
Foreign Proceeding pending before the courts of
England & Wales.
____________________________________________/

**DECLARATION OF STEVEN CRAIG MCDONALD IN SUPPORT OF THE APPLICATION OF FOR JUDICIAL ASSISTANCE IN AID OF FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

1. I, Steven Craig McDonald, under penalty of perjury and pursuant to 28 U.S.C. § 1746 and the laws of the United States of America, declare the following.

2. I am over the age of 18. I am solicitor (i.e. an attorney) licensed in England & Wales. I have been practicing in the United Kingdom for over 15 years.

3. Except as otherwise noted, I provide this Declaration based on my personal knowledge and experience.

## A. INTRODUCTION

4. I am a Partner at Gresham Legal, English legal counsel for the Applicants. I have day-to-day conduct of the proceedings in the English High Court to which this Application relates. I have my professional address at 9 Old Square, Lincoln's Inn, London WC2A 3SR.

5. I attach hereto a bundle of documents to which I will refer in this Declaration, which is labelled Exhibit "**SCM1**". References in this Declaration to page numbers are references to the numbered pages in Exhibit A in the format **SCM1/ [page number].**

6. I make this Declaration in support of an application by the Applicants which seeks an Order from the Court compelling discovery of certain categories of documents from the Respondents pursuant to 28 U.S.C. § 1782 in support of extant proceedings in the English High Court (the "**Application**"). I set out further detail in respect of these proceedings below.

7. The remainder of this Declaration is structured as follows:

a. **SECTION B – THE RELEVANT FOREIGN PROCEEDINGS**
b. **SECTION C – THE RESPONDENTS TO THE APPLICATION**
c. **SECTION D – THE DOCUMENTS SOUGHT**
d. **SECTION E – THE DEPOSITIONS SOUGHT**
e. **SECTION F – OTHER CONSIDERATIONS AND THE INTEL FACTORS**

## B. THE RELEVANT FOREIGN PROCEEDINGS

8. In this section of my Declaration I provide detail in relation to the foreign proceedings in which any documents produced pursuant to this Application will be used.

***The Parties***

9. The Applicants are each Claimants (i.e. Plaintiffs) in proceedings brought in the Business and Property Courts of England and Wales, Chancery Division[1], in the Business List, with Claim Number: BL-2025-000695 (the "**Foreign Proceedings**").

10. The Applicants and Claimants are as follows:

[1] A division of the High Court of England and Wales

a. Clivedale Ventures Limited ("**CVL**") a company incorporated under the laws of England and Wales;

b. Clivedale Overseas Limited ("**Clivedale Overseas**") a company incorporated under the laws of the Bahamas;

c. Papiss Limited ("**Papiss**") a company incorporated under the laws of the Bailiwick of Jersey (a self-governing British crown dependency); and

d. IPMT Limited ("**IPMT**"), a company incorporated under the laws of England and Wales.

11. Each of the Applicants are entities associated with the "**Clivedale Group**", a London-based super-prime property developer.

12. The current Defendants to the Foreign Proceedings are as follows:

a. H.I.G. Capital International Advisors LLP ("**HIG Advisors**"), a limited liability partnership incorporated under the laws of England and Wales;

b. H.I.G. European Capital Partners LLP ("**HIG Europe**"), a limited liability partnership incorporated under the laws of England and Wales;

c. Tempus Holdings 99 S.à.r.l. ("**Tempus**"), a private limited company incorporated under the laws of Luxembourg; and

d. David Laycock ("**Mr Laycock**"), an English national, domiciled in England.

13. The Defendants described at paragraphs 9(a)-9(c) above are part of H.I.G. Capital ("**HIG**"), an international global alternative assets investment firm, headquartered in Miami, and said to have US$ 70 billion in capital under management (the "**HIG Defendants**"). Mr Laycock was employed by CVL between 23 October 2012 and around 30 June 2023 (and CEO of the Clivedale Group from 1 April 2022 to 17 May 2023).

***The Disputes***

14. I set out a summary of the Foreign Proceedings below (and exhibit the Claimants' Particulars of Claim at [**SCM1/1-24**]).

*The Joint Venture*

15. On 21 December 2021, the Clivedale Group (through Papiss) and HIG (through Tempus) entered into a joint venture agreement in respect of a substantial commercial real estate development project at 20-24 Carlton House Terrace in the St James's district of Westminster, Central London (the "**Development**" and the "**JV Agreement**"). Pursuant to the JV Agreement, the Clivedale Group and HIG invested in the Development via a corporate entity, Jonah Limited (a company incorporated under the laws of the Bailiwick of Jersey) which in turn controlled and owned a special purpose vehicle, Noah Limited (also a company incorporated under the laws of the Bailiwick of Jersey) ("**Noah**"). Noah owned the Development. Pursuant to the JV Agreement:

a. the Clivedale Group (through Papiss) were to make an initial capital contribution of £20,000,000 and a contingent capital contribution of £2,226,869; and

b. HIG (through Tempus) was to make an initial capital contribution of £55,000,000 and a contingent capital contribution of £6,123,890.

16. To further fund the Development, Noah entered into a credit facility dated 20 December 2021 arranged by the London Branch of Deutsche Bank ("**DB**" and the "**DB Facility**").

17. In or around late 2022, Tempus, represented by a Mr Christopher Zlatarev (who the Claimants understand to be the Managing Director of H.I.G. Realty Partners in London and an LLP Member of HIG Advisors), and Papiss, represented by Mr Laycock, informed DB that they anticipated significant cost overruns of approximately £12 to £14 million on the Development (the "**Costs Overrun**"), a sum in excess of that funded by costs overrun guarantees provided to DB by Papiss and Tempus (which were equal to the amounts of the parties' contingent capital contributions as set out at paragraphs 12(a)-(b) above) (the "**Cost Overrun Guarantees**"). In order to draw down further tranches of the DB Facility, Noah was required to fund the Costs Overrun to the extent it was not covered by the Cost Overrun Guarantees. The Applicants' position is that the

additional capital required by Noah to fund the Costs Overrun could and should have been met by Tempus (i.e. HIG) because:

a. pursuant to the JV Agreement, the parties had agreed that Papiss had already provided its initial capital commitment of £20m in full and that, until such time as Tempus had provided its own initial capital commitment in full, all further committed capital (which included contingent capital contributions) was to be provided by Tempus; and

b. as at the end of 2022 (i.e, at the time of the Costs Overrun), Tempus had not provided its £55 million initial capital commitment in full.

18. However, rather than comply with the terms of the JV Agreement (as understood by the Claimants), Mr Laycock (on behalf of Papiss) and Mr Zlatarev (on behalf of Tempus) agreed that the Costs Overrun would be met (as in fact they were met) by:

a. Tempus providing additional funding in the amount of £4,397,624 (the "**Tempus Costs Overrun Contribution**"); and

b. Papiss providing additional funding in the amount of £1,599,136 (such sums having been calculated pro rata by reference to the parties' initial capital commitments, the "**Papiss Costs Overrun Contribution**"); with

c. The Tempus Costs Overrun Contribution, but not the Papiss Costs Overrun Contribution, being treated as made pursuant to its initial capital commitment.

19. The Applicant's case is that this agreement between Mr Laycock and Mr Zlatarev was not in the Claimant's best interests and that, in making the agreement, Mr Laycock acted contrary to and in breach of various duties (including both fiduciary and contractual duties) which he owed to his employer (CVL) and other of the Claimants by virtue of his position as a *de jure* or *de facto* director of various other of the Clivedale Group companies.

*<u>Proposed New Venture(s)</u>*

20. In around June 2022, Mr Laycock brought a potential development opportunity (Heythrop College in Kensington Square, Central London) to the attention of Clivedale Group's ultimate beneficial owner, Mr Sameer Gehlaut ("**Mr Gehlaut**"). Heythrop College covers an area

of c2.7 acres (377,200 $ft^2$) and was part of the University of London between 1971 and 2018. Accordingly, Heythrop College offered a unique opportunity to develop a large site in a super prime location in Central London. Mr Gehlaut subsequently visited the Heythrop College site and informed Mr Laycock that he was interested in pursuing the development. The projected profit for the Heythrop College development was £162,000,000. Also in 2022, Mr Laycock approached Mr Gehlaut to discuss leaving his position at Clivedale Group. He informed Mr Gehlaut that he wished to set up his own development management company with members of the IPMT team. Mr Laycock additionally proposed that this new company would provide services to existing Clivedale Group projects.

21. Mr Gehlaut did not initially consent to Mr Laycock's proposal. However, unbeknownst to the Claimants and Mr Gehlaut at the time, Mr Laycock and another CVL employee (Mr Scarlett) proceeded, in any event, to incorporate a new corporate entity, Altius Real Estate Limited ("**Altius**"), on 6 January 2023 and, in May 2023, Mr Laycock, together with Mr Christopher Hill (an employee of IPMT), both left the Clivedale Group to work full-time for Altius.

22. The Applicants' case is that Mr Laycock and at least Mr Scarlett and Mr Hill had in fact begun to work with HIG and/or Tempus in relation to development projects (including Heythrop College) for which Altius might bid jointly in the nine months before they eventually left Clivedale Group in May 2023 and at a time when they were still in the full-time employ of Clivedale Group. The Claimants have identified evidence which supports this including (i) an email sent by Mr Laycock on 13 January 2023, in which he stated that "*HIG are on board" with the Development being put "through new co [i.e. Altius] as a DM role*"[**SCM1/25-27**]; and (ii) a draft email shared on 25 March 2023 by Mr Laycock with Mr Scarlett and Mr Hill in which it was explained that, amongst other things, they (i.e., Altius) "*are bidding with HIG Reality [sic]", that*

*"[l]ast year we bid on opportunities with HIF all of which were supported by the credit team in the UK" and that "HIG and Altius have agreed to do 2 projects per annum together*" [S**CM1/28-30**].

23. Further, these development projects were each opportunities that the Clivedale Group could have pursued as investor and/or development manager. They were as such opportunities that Mr Laycock was obliged as an employee and director to bring to the attention of Clivedale Group and, in particular, CVL, Clivedale Overseas and/or IPMT and/or to pursue for the benefit of Clivedale Group, CVL, Clivedale Overseas and/or IPMT, but he did not do so. As regards Heythrop College in particular, in circumstances where the Heythrop College development was subsequently pursued by Mr Laycock through Altius together with HIG to the exclusion of Clivedale, the Applicants infer that Mr Laycock instead chose to take the opportunity to HIG for its benefit and to the detriment of Clivedale Group.

*The Claimants' Dishonest Assistance Claim*

24. The first of the Applicants' causes of action in the Foreign Proceedings, as against the HIG Defendants, is in so called "dishonest assistance". To explain further, under English law a claim for dishonest assistance (a cause of action in equity) is typically one in which a third party or third parties (in this case the HIG Defendants) has/have assisted the primary wrongdoer (in this case Mr Layock) to commit a fraud[2]. The key elements for claim for dishonest assistance are:

a. a breach of trust or fiduciary duty by the primary wrongdoer(s);

b. the third party to have assisted the primary wrongdoer in this breach; and

c. the third party to have had a dishonest state of mind.

---

[2] There is no single civil cause of action in fraud under English law. Instead, the term is an umbrella term for causes of action which involve an element of dishonesty. It therefore covers deceit and fraudulent mis-representation together with unlawful means conspiracy, intention to injure and other economic torts.

25. It is the Applicants' position that some or all of the HIG Defendants are liable to Papiss and or CVL in dishonest assistance on account of:

a. The inducement of Mr Laycock's breach of his fiduciary duties to Papiss and/or CVL in respect of the Papiss Costs Overrun Contribution as described at paragraphs 18 to 19 above; and

b. Such inducement being dishonest insofar as some or all of the HIG Defendants knew or ought to have known that (i) Mr Laycock owed fiduciary duties; (ii) it was not in the interests of CVL or Pappiss to agree to make the Papiss Costs Overrun Contribution (as it in fact did); and (iii) Mr Laycock was working on projects such as Heythrop College to the exclusion of the Clivedale Group (by whom he was employed).

26. This dishonest assistance of Mr Laycock's breach of fiduciary duties caused Papiss to suffer loss and damage in the amount of £1,599,136 (i.e., the Papiss Costs Overrun Contribution).

27. The HIG Defendants deny Papiss' and CVL's dishonest assistance claims.

*The Claimants' Unlawful Means Conspiracy Claim*

28. The second of the Applicants' causes of action in the Foreign Proceedings, as against the HIG Defendants (and, in fact, Mr Laycock), is in so called "unlawful means conspiracy". Again, to explain further, under English law a claim for unlawful means conspiracy (a civil economic tort) is typically one in which two or more individuals collude together to harm another using illegal methods. The key elements for a claim for unlawful means conspiracy are[3]:

a. A combination or agreement between two or more legal persons;

b. Concerted action pursuant to the agreement;

c. The action uses unlawful means (which unlawful means may include a breach of contract or breach of fiduciary duty);

d. The conspirators intend to injure the claimant; and

---

[3] *See*, e.g., *Kuwait Oil Tanker Company SAK v Al-Bader (No.3) [2000]* 2 All E.R. (Comm) 271 at [108]) [**SCM1/31-105**]

e. The claimant does in fact suffer damage.

29. It is the Applicants' position that each of these elements has been fulfilled as follows:

a. At least Tempus, Mr Zlatarev and Mr Laycock (the "**Conspirators**") combined together and/or acted in concert with another pursuant to an agreement or common understanding;

b. Pursuant to this agreement the Conspirators: (i) caused Papiss to agree to make the Papiss Costs Overrun Contribution (which it in fact did); and (ii) pursued projects such as Heythrop College to the exclusion of the Clivedale Group.

c. The agreement was effected by unlawful means including: (i) Mr Laycock's breach of fiduciary duties; and (ii) Mr Laycock's breach of contractual duties under his employment contract with CVL; and (iii) Tempus's dishonest assistance as set out at paragraphs 24 to 26 above. Unlawful means does not require showing conduct that is inherently criminal or would have a burden of proof similar to criminal conduct.

d. The intention to cause loss is to be inferred (pending discovery pursuant to this Application and the disclosure stage in the Foreign Proceedings) from facts and matters set out above including: (i) Mr Laycock's breach of fiduciary duties; (ii) Tempus' inducement of Mr Laycock to breach such fiduciary duties; (iii) Mr Laycock's breach of his contractual duties under his employment contract; (iv) Mr Laycock' incorporation of Altius at the time that Papiss agreed to make the Papiss Costs Overrun Contribution; (v) Mr Laycock's pursuit of projects such as Heythrop College at a time when he was employed by CVL; (vi) Mr Laycock's misrepresentation as to the nature of both the Tempus Costs Overrun Contribution and the Papiss Costs Overrun Contribution; (vii) the benefits conferred by Tempus (amongst others) via his 50% ownership of Altius in the form of Altius' appointment as development manager for the Development and other HIG developments; and (viii) the benefits conferred on Tempus (and other of the HIG Defendants) in the form of the Papiss Costs Overrun Contribution and of participation in projects such as Heythrop College.

e. The Conspirators: (i) caused Papiss to suffer loss and damage in the amount of £1,599,136 (i.e., the Papiss Costs Overrun Contribution); and (ii) pursued the development projects (including Heythrop College) to the exclusion of Clivedale causing loss of profits from such developments; (iii) caused wasted expenditure on the salaries of members of the IMPT team including Mr Laycock and Mr Scarlett who were employed to work for Clivedale Group but were in fact pursuing the

project (such as Heythrop College) for their own and/or HIG's benefit but to Clivedale Group's detriment.

30. The HIG Defendants (and Mr Laycock) each deny the Applicants' unlawful means conspiracy claim in the Foreign Proceedings.

***The Procedural Background***

31. I outline the procedural background to the Foreign Proceedings below:

*a.* 23 May 2025 - the Claimants filed their claim form and particulars of claim.

*b.* 12 June 2025 – the Defendants filed their acknowledgments of service.

*c.* 21 July 2025 – the Claimants discontinued their claim as against HIG Capital.[4]

*d.* 25 July 2025 – the Defendants filed their defences.

*e.* 29 August 2025 – the Claimants filed their replies.

*f.* 20 October 2025 – the HIG Defendants filed an application to strike out the Claimants' claims against them.

## C. THE RESPONDENTS TO THE APPLICATION

32. In this section of my Declaration, I provide further detail in respect of the Respondents to the Application and explain why the Applicants believe that these Respondents hold documents relevant to the Foreign Proceedings.

33. The Applicants make this application against the following Respondents, each of whom are understood to be either domiciled or resident in the USA:

a. H.I.G Capital, LLC ("**HIG Capital**") – a limited liability corporation incorporated under the laws of the state of Delaware in the USA. The HIG Capital website describes HIG Capital as being headquartered at 1450 Brickell Avenue, 31st Floor, Miami, FL 33131.[5] The Applicants understand that HIG Capital is the ultimate

---

[4] HIG Capital was named as a defendant in the Foreign Proceedings when the Claimants first filed their claim on 23 May 2025. However, following receipt of correspondence from the Defendants' legal counsel opposing the Claimants' application to serve HIG Capital outside of the jurisdiction on the basis of HIG Capital not being a proper party, the Claimants (by their former English legal counsel) thereafter discontinued their claim as against HIG Capital.

[5] https://hig.com/contact/ **[SCM1/106-112]**

beneficial owner of the funds which own and control Tempus, which is the vehicle through which HIG invested in the Development (as per paragraph 15 above).

b. Sami Mnaymneh – founder, executive chairman and CEO of HIG Capital. Mr Mnaymneh is a US Citizen[6] who is listed on the HIG Capital website as being based in London and Miami, Florida[7] and is described in other public sources as having his residence in Miami Beach, Florida.[8] The HIG Capital website further describes that Mr Mnaymneh "*approves all capital commitments made by H.I.G*."

c. Tony Tamer - founder and executive chairman of HIG Capital. Mr Tamer is a US citizen[9] who is listed on the HIG Capital website as being based in Miami, Florida and New York City, New York[10] and is described in other public sources as having his residence in New York, New York.[11] The HIG Capital website further describes that Mr Tamer has "*directed H.I.G.'s development since its founding in 1993 and approves all capital commitments made by H.I.G.*."

d. Rick Rosen – co-president of HIG Capital. The Applicants understand that Mr Rosen is a US Citizen. Mr Rosen is listed on the HIG Capital website as being based in Miami, Florida[12] and other public sources indicate that Mr Rosen is resident in Coral Gables, Florida.[13] The HIG Capital website further describes that Mr Rosen "*directs the day-to-day operations of the firm and sits on the investment committees for all H.I.G. funds*."

e. Brian Schwartz – co-president of HIG Capital. The Applicants understand that Mr Schwartz is a US Citizen. Mr Rosen is listed on the HIG Capital website as being based in Miami, Florda[14] and other public sources indicate that Mr Rosen is resident in Miami, Florida.[15] The HIG Capital website further describes that Mr Schwartz "*directs the day-to-day operations of the firm and sits on the investment committees for all H.I.G. funds*."

---

[6] https://find-and-update.company-information.service.gov.uk/officers/KsSBfTeRVY52l9VjGB4wV1utPjk/appointments [**[SCM1/113]**

[7] https://hig.com/team/sami-mnaymneh/ **[SCM1/114]**

[8] https://www.forbes.com/profile/sami-mnaymneh **[SCM1/116]**

[9] https://find-and-update.company-information.service.gov.uk/officers/99itYAPbrUxbXD08WFq7Q8_k5XA/appointments **[SCM1/118]**

[10] https://hig.com/team/tony-tamer/ **[SCM1/120]**

[11] https://www.forbes.com/profile/tony-tamer **[SCM1/122]**

[12] https://hig.com/team/rick-rosen/ **[SCM1/126]**

[13] https://jillszeder.com/agents/kara-zederSami-rosen/ **[SCM1/128]**

[14] https://hig.com/team/brian-schwartz/ **[SCM1/131]**

[15] https://jewishmiami.org/news/extra/brian_schwartz/ **[SCM1/133]**

34. I have reviewed SEC filings from around the time that the JV Agreement was negotiated. In these filings, HIG Capital describes how its investment process is "*centered around its investment committees which review all of H.I.G. Capital's deals across all strategies …benefitting from years of accumulated pattern-recognition experience of H.I.G. Capital's key decision makers: firm co-founders Mr. Mnaymneh and Mr. Tamer and firm co-presidents Rick Rosen and Brian Schwartz.*"[16]

35. In summary therefore:

a. HIG Capital's investment process is centred around its "investment committees" which review all of HIG Capital's deals;

b. Mr Rosen and Mr Schwartz sit on the investment committees for "*all H.I.G. funds*"; and

c. Mr Mnaymneh and Mr Tamer "*approv[e] all capital commitments made by H.I.G.".*

36. In circumstances where the Foreign Proceedings concern: (i) an investment in the Development as described at paragraph 15 above; (ii) a capital commitment in the form of the Tempus Costs Overrun Contribution; and (iii) potential investments in developments such as Heythrop College (as described at paragraph 20 above), it follows that it is likely that each of the Respondents are likely to have documents relevant to the Foreign Proceedings within their possession, custody or control.

37. Further, as described at paragraph 12 above, *prima facie* none of the Respondents are Defendants to the Foreign Proceedings. As such, under English Law, the Applicants do not have an automatic legal right to obtain disclosure (i.e. discovery) from the Respondents.

---

[16] https://www.sec.gov/Archives/edgar/data/1823776/000119312520256732/d863069ds1.htm **[SCM1/134-334]**

## D. THE DOCUMENTS SOUGHT

38. The Applicants seek production of the following categories of documents from the Respondents:

a. **Category 1** - Documents in the custody, possession, or control of the Respondents relating to the building costs (including but not limited to the Costs Overrun) of the Development created or received in the period 1 September 2022 to 1 June 2023. For the avoidance of doubt this includes internal documents recording any discussion or decisions (including investment committee papers) in relation to such building costs.

b. **Category 2** - Documents in the custody, possession, or control of the Respondents relating to any consideration of investment in or development of Heythrop College created or received in the period 1 June 2022 – 30 June 2023. For the avoidance of doubt this includes internal documents recording any discussion or decisions (including investment committee papers) in relation to Heythrop College.

c. **Category 3** - Documents in the custody, possession, or control of the Respondents relating to investment or development opportunities offered to, by, or in conjunction with Altius (or its principals) created or received in the period 6 September 2022 – 30 June 2023. For the avoidance of doubt this includes internal documents recording any discussion or decisions (including investment committee papers) in relation to such investment or development opportunities.

d. **Category 4** - Documents in the custody, possession, or control of the Respondents relating to any investment or development opportunities received from any of Mr Laycock, Mr Scarlett, Mr Christopher Hill, or Mr Duncan Crouch created or received in the period 1 June 2022 – 30 June 2023. For the avoidance of doubt this includes internal documents recording any discussion or decisions (including investment committee papers) in relation to such investment or development opportunities.

e. **Category 5** – Documents in the custody, possession, or control of the Respondents which evidence and/or relate to any communications between HIG Capital, on the one hand, and Altius and/or Messrs Laycock, Scarlett, Hill and/or Crouch, on the other hand, in respect of any investment or development opportunities which are the subject of Categories 2, 3 and 4 above, created or received during the applicable time periods specified in each of Categories 2, 3 and 4.

39. These categories have been narrowly formulated so as to be proportionate to the needs of the Foreign Proceedings as follows:

a. **Category 1** – This category is focused solely on the Development and is time limited to the period 1 September 2022 – 1 June 2023. This period starts at the approximate date at which the Costs Overrun began to manifest and ends at the date on which Papiss made the additional payment as agreed between Mr Zlatarev and Mr Laycock in respect of the Costs Overruns (as set out at paragraph 18.b above).

b. **Category 2** – This category is focused solely on the potential development of Heythrop College (as detailed at paragraphs 20 to 23 above) and is time limited to the period 1 June 2022 – 30 June 2023. This period starts at the date on which Mr Laycock first brought Heythrop College to the attention of Mr Gehlaut and ends at the date that Mr Laycock ceased to be employed by CVL.

c. **Category 3** – This category is focused solely on investment or development opportunities related to a single corporate entity, Altius, and is time limited to the period 6 September 2023 – 30 June 2023. This period starts four months before the date on which Altius was incorporated and ends at the date that Mr Laycock ceased to be employed by CVL.

d. **Category 4 -** This category is focused solely on investment or development opportunities related to four individuals, namely:

    i. Mr Laycock – Clivedale Group's former CEO and Defendant to the Foreign Proceedings;

    ii. Mr Scarlett – Managing Director at Clivedale Group between January 2013 and June 2023.[17] Mr Laycock's business partner and shareholder in Altius;

    iii. Mr Hill – Development Director at Clivedale Group between August 2013 and July 2013. Employed by Altius since July 2023[18] ; and

    iv. Mr Crouch – Project Director (Development) at Clivedale Group between April 2022 and June 2023. Employed by Altius between June 2023 and September 2025.[19]

    The category is time limited to the period 1 June 2022 – 30 June 2023. This period starts at the date on which Mr Laycock first brought Heythrop College to the attention of Mr Gehlaut and ends at around the date that Mr Laycock, Mr Scarlett, Mr Hill and Mr Crouch ceased to be employed by CVL.

e. **Category 5** – This category is focused solely on communications between HIG on the one hand, and Altius and relevant individuals on the other, relating to any

---

[17] https://www.linkedin.com/in/fred-scarlett-4656b46/ **[SCM1/335]**
[18] https://www.linkedin.com/in/christopher-hill-3704ba31/?originalSubdomain=uk **[SCM1/337]**
[19] https://www.linkedin.com/in/duncan-crouch-b9227523/ **[SCM1/339]**

investment or development opportunities which are the subject of Categories 2, 3 and 4 and is time limited to the period applicable to each of those Categories.

**E. THE DEPOSITIONS SOUGHT**

40. The HIG Defendants have been asked to confirm whether they intend to adduce evidence from each of Sami Mnaymneh, Tony Tamer, Rick Rosen, and Brian Schwartz (together the "**US Executives"**). The HIG Defendants have not properly engaged with that question, simply stating *"[they] will not provide the confirmations sought because there is no procedural requirement that they should do so*". [**SCM1/340.1-341**]

41. In circumstances in which each of the US Executives is said to be involved in the decision making of HIG Capital and its subsidiaries, the Applicants seek subpoenas for the depositions of the US Executives in respect of facts and matters relevant to the Foreign Proceedings.

**F. OTHER CONSIDERATIONS AND THE INTEL FACTORS**

**Party to the proceedings**

42. As set out above, HIG Capital is not a party to the Foreign Proceedings. Its own case was that it was not an appropriate party and the case against it was discontinued thereafter.

43. None of the US Executives is a party to the Foreign Proceedings.

**Nature of the foreign tribunal and receptivity**

44. The Foreign Proceedings are taking place in the Business and Property Courts of England and Wales, Chancery Division. The Business and Property Courts of England and Wales are the court of first instance for high value disputes in England and Wales.

45. As an English qualified lawyer, I can confirm that use of 28 U.S.C. § 1782 proceedings in support of English proceedings is generally acceptable to the English courts.[20] That

---

[20] See for example, *South Carolina Insurance v Assurantie Maatschappij [1987] 1 AC 24* **[SCM1/343-364]** and *Soriano v Forensic News LLC [2023] EWCA Civ 223* being two appellate court decisions. **[SCM1/365-372]**

it is legitimate for a party to seek to make use of procedures such as this application to prepare and present their case in the English courts has very recently been reconfirmed in a judgment of the Business and Property Courts.[21]

46. As regards the admissibility of documents produced by way of 28 U.S.C. § 1782, such documents are admissible at trial in proceedings before the Business & Property Courts of England and Wales, provided they are properly disclosed to the other parties to the proceedings, once obtained. The circumstances in which documentary evidence is inadmissible in civil proceedings before the English courts is very limited. It includes:

a. As above (absent permission of the Court), if a document has not been properly disclosed by the party seeking to rely on it; and

b. If the document is protected by privilege and that privilege has not been waived or otherwise lost.

47. Otherwise, any relevant evidence is admissible, even evidence obtained by unlawful means may not necessarily be inadmissible in civil proceedings. Per the recent case of *Ras Al Khaimah Investment Authority v Azima* [2021] EWCA Civ 349 at [41] **[SCM1/431-466]**:

> *Cases of evidence procured by torture aside, the general rule of English law is that evidence is admissible if it is relevant to the matters in issue. If it is, it is admissible and the court is not concerned with how the evidence was obtained. Relevant evidence is admissible even if it has been stolen …*

48. Accordingly, documents produced pursuant to a subpoena issued on this application would be admissible as evidence in the Foreign Proceedings. Such documents would include the transcripts of depositions of the US Executives.

**Circumvention**

---

[21] *See, BHP Group (UK) Ltd and BHP Group Limited v PGMGM Law Ltd [2025] EWHC 3153 (TCC)* **[SCM1/373-410]**. See also *Dreymoor v Eurochem [2018] EWHC 2267* **[SCM1/411-430]**

49. The procedural rules applicable to the Foreign Proceedings (the English Civil Procedure Rules) provide for parties to litigation to disclose and produce for inspection a broad range of documents that are within their possession or control.

50. The controlling factors on document disclosure in proceedings before the Business and Property Courts of England and Wales are reasonableness and proportionality.

51. The categories of documents sought by this Application are akin to those that would be within disclosure once ordered in the Foreign Proceedings. However, such an order can only be made against a party to the Foreign Proceedings. Whilst there is provision for non-parties to proceedings before the Business and Property Courts of England and Wales to be required to produce documents for use in proceedings, that jurisdiction, and particularly the compulsory power to enforce production, is generally limited to third parties that fall within the jurisdiction of the English courts. I note that the English courts have made orders against parties outside the territory of England and Wales for the production of documents but that has concerned documents which have themselves been within the territory of England and Wales.

52. Similarly, the English courts have jurisdiction to summons (compel) a person to give evidence at trial. However, that jurisdiction is limited to persons within the jurisdiction of the English courts.

53. As set out above, HIG Capital is based in the US and each of the US Executives is also said to be resident in the US. Accordingly, *prima facie*, they are each outside the jurisdiction of the English court, absent their submission to it. As further set out above, they have declined to engage on the Applicants' requests to voluntarily produce the classes of documents sought by this Application and have further declined to confirm that they will provide, voluntarily, witness evidence at trial of the Foreign Proceedings.

54. I also draw the Court's attention to the English court's approach to possession and control for the purposes of disclosure in English proceedings. In general terms, as between a parent entity and a subsidiary, particularly a subsidiary for which the parent has the right to appoint the majority of directors, documents of the subsidiary will likely, absent any special circumstances, be considered within the control of the parent company. However, the reverse is not the same, a subsidiary will not be considered to be in possession and control of documents of its parent entity unless it has an express right to them or otherwise such documents have habitually been provided to it by the parent entity when documents have been requested. The English court will look to the true nature of the relationship between a third party and party to proceedings to determine whether documents in the possession of the third party are, in fact, within the control of the party to the proceedings.

**Proportionality**

55. The document production requests made in this application have been designed to be akin to what would be considered reasonable and proportionate as a matter of English civil procedure, taking account of the importance of the case, the means of the parties and that the case raises very serious issues of fraud, dishonesty and conspiracy.

*Signature on the following page*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 22, 2025.

Steven Craig McDonald